Mark E. Ellis - 127159
June D. Coleman - 191890
Kimberly E. Lewellen - 243663
ELLIS, COLEMAN, POIRIER, LAVOIE, & STEINHEIMER LLP
555 University Avenue, Suite 200 East
Sacramento, CA  95825
Tel: (916) 283-8820
Fax: (916) 283-8821

Attorneys for Plaintiff
PLAINTIFF JOHN LAW

UNITED STATES DISTRICT COURT

U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA

NORTHERN DISTRICT, SAN FRANCISCO DIVISON

| | |
|---|---|
| JOHN LAW,<br><br>        PLAINTIFF,<br><br>v.<br><br>LARRY HARVEY, MICHAEL MIKEL, PAPER MAN, LLC., and BLACK ROCK CITY, LLC,<br><br>        DEFENDANTS. | Case No.:  C 07-0134 WHA<br><br>**FIRST AMENDED COMPLAINT** |

**JURISDICTION AND VENUE**

1.     The Court has jurisdiction under 15 U.S.C. § 1121, and 28 U.S.C. § 1338(a) in that this case arises under the Trademark Laws of the United States, 15 U.S.C. §§ 1051 et seq.

2.     The Court has jurisdiction of the unfair competition claims herein under the provisions of 28 U.S.C. § 1338(b) in that said claims are joined with a substantial and related claim under the Trademark Laws of the United States, 15 U.S.C. §§ 1051 et seq.

3.     Venue is proper in the Northern District of California pursuant to 15 U.S.C. § 1391(b).

**THE PARTIES**

4.     Plaintiff John Law (hereinafter "Plaintiff") is a citizen of the State of California who

- 1 -

1  resides in Brisbane, California.

2      5.      Plaintiff has been a neon sign craftsman and tradesman by profession.  From 1988 to

3  1990, he was employed full time by the American Neon Sign Company, and by Ad-Art from

4  approximately 1990 to 1992.  Plaintiff left Ad-Art in 1992 to form Central Services, a neon sign

5  business that he owned in partnership with Chris Radcliff.  Central Services provided Plaintiff with a

6  comfortable income.

7      6.      By 1986, Plaintiff had become well known and recognized in San Francisco's

8  alternative art scene through his work and participation with various performance art groups like the

9  Suicide Club and Communiversity.

10     7.      In 1986, "The Cacophony Society" (hereinafter "Cacophony") was created.  Cacophony

11 was a collective endeavor, self described as "a network of free spirits united in the pursuit of

12 experiences beyond the pale of mainstream society."  Plaintiff was one of Cacophony's original

13 members and a primary organizer.

14     8.      As one of Cacophony's principle organizers, Plaintiff was continually searching for

15 new, different and unique places to stage events and to which he could lead Cacophony members.

16 During this time, he learned about the high desert in Nevada, an enormous, vast, flat, arid, and

17 desolate, "lifeless and cracked void" of a dry lake bed two and a half hours north of Reno.  Plaintiff

18 thoroughly explored the high desert during the late 1980s during which time he became uniquely and

19 thoroughly well acquainted with the area's geography, topology, history, residents, merchants,

20 authorities and culture.

21     9.      Plaintiff is informed and believes and thereupon alleges that defendant Larry Harvey

22 (hereinafter "Harvey") is a citizen of the State of California who resides in San Francisco, California.

23     10.     Plaintiff is informed and believes and thereupon alleges that during the several years

24 prior to 1986, Harvey held a number of odd jobs, eventually becoming a free lance gardener in San

25 Francisco to those with little means and offbeat landscape ideas.

26     11.     Plaintiff is informed and believes and thereupon alleges that Harvey had no knowledge

27 of the Nevada high desert before he was introduced to it by Plaintiff.

28     12.     Plaintiff is informed and believes and thereupon alleges that defendant Michael Mikel

(hereinafter "Mikel") is a citizen of the State of California who resides in San Francisco, California.

- 2 -

FIRST AMENDED COMPLAINT

1       13.   Plaintiff is informed and believes and thereupon alleges that Plaintiff met Mikel shortly

2   after Mikel joined Cacophony in mid to late 1989.  Mikel became active with Cacophony, eventually

3   editing Cacophony's newsletter and actively assisting Plaintiff in organizing Cacophony events.

4   Plaintiff and Mikel became close friends through Cacophony.  Because Mikel had been unemployed

5   for the most part during his first years with Cacophony, Plaintiff employed him as Central Service's

6   bookkeeper and trained him in the trade.

7       14.   Plaintiff is informed and believes and thereupon alleges that defendant Paper Man, LLC

8   (hereinafter "Paper Man") is a California limited liability company with its principle place of business

9   in Oakland, California.

10       15.   Plaintiff is informed and believes and thereupon alleges that defendant Black Rock

11   City, LLC (hereinafter "BRC") is a Nevada limited liability company formed in 1997 with its principle

12   place of business in San Francisco, California.  BRC is registered in the State of California as a foreign

domestic entity with a listed agent for service of process in California.

13       16.   Plaintiff is informed and believes and thereupon alleges that Harvey is BRC's chairman,

14   director and/or leading managing member.

15       17.   Plaintiff is informed and believes and thereupon alleges that Mikel is a member of

16   BRC's executive board, board of directors and/or decision making body.

17       18.   Plaintiff is informed and believes and thereupon alleges that at all pertinent times,

18   Harvey, Paper Man and BRC were the alter egos of each other.

19       19.   Plaintiff is informed and believes and thereupon alleges that Harvey, Paper Man and

20   BRC were each other's agent, representative, joint venturer and representative, and in doing the things

21   hereafter alleged, each was acting within and outside of the course and scope of said agency, joint

22   venture and representation with each other's advance knowledge, acquiescence or subsequent

23   ratification.

24       20.   Plaintiff is informed and believes and thereupon alleges that Harvey, Paper Man and

25   BRC, individually and in concert, knew or reasonably should have known that their conduct as alleged

26   herein was wrongful and constituted a breach of duty and that each gave substantial assistance to the

27   other in accomplishing the wrongful conduct and breaches of duty alleged herein.

    21.   Plaintiff is informed and believes and thereupon alleges that Harvey, Paper Man and

28

FIRST AMENDED COMPLAINT

BRC are and at all pertinent times have been each other's alter ego in that there exists and existed a unity of interests and ownership such that any separateness between any of them has ceased to exist. Namely, Harvey completely controlled, dominated, managed and operated Paper Man and BRC; their assets were intermingled to suit Harvey's convenience; and each party's funds were commingled with the other parties' funds.

22.    Plaintiff is informed and believes and thereupon alleges that Harvey exercised complete control and dominance over Paper Man and BRC to such an extent that any individuality or separateness of identity between the two does not and at all pertinent times did not exist.

23.    Plaintiff is informed and believes and thereupon alleges that BRC exercised complete control and dominance over Paper Man to such an extent that any individuality or separateness of identity between the two does not and at all pertinent times did not exist.

24.    Plaintiff is informed and believes and thereupon alleges that adherence to the existence of separate juristic fictions would abuse the corporate privilege and would produce inequitable results in that Harvey would be able to evade payment of his personal obligations to creditors and avoid liability to Plaintiff.

25.    Plaintiff is informed and believes and thereupon alleges that adherence to the existence of separate corporate fictions would abuse the corporate privilege and would produce inequitable results because of the probability that Harvey has pilfered or will pilfer corporate assets for his own personal use and would cause the juristic entities to file for protection under the United States Bankruptcy Code to avoid satisfying any judgment resulting from this lawsuit.

## FACTS COMMON TO ALL CLAIMS

26.    Plaintiff is informed and believes and thereupon alleges that in the late 1970s, a popular San Francisco artist (the "Artist") began hosting a series of "spontaneous art-party happenings" on San Francisco's Baker Beach. As part of the activities, the Artist and her guests built sculptures with materials that washed up on the shore, and later in the evening "torched" (i.e., burned) the sculptures. The parties often were held on the summer solstice, but not always. The Artist stopped hosting the beach parties in or before 1985.

27.    Plaintiff is informed and believes and thereupon alleges that defendant Harvey began to attend the Artist's parties in the early 1980s and was taken with the idea of freely creating and burning

- 4 -

art without institutional or authoritarian interference.  He attended the Artist's remaining annual parties.

28.     Plaintiff is informed and believes and thereupon alleges that in 1986, the year following the Artist's final "spontaneous art-party happening," Harvey and his friend Jerry James saw the 1973 British cult film "The Wicker Man" and were inspired to carry on the tradition of burning art at an annual party on Baker Beach without the Artist's participation.  In preparation, James, a builder and contractor by trade, designed, engineered and built an impromptu eight foot tall wooden figure.

29.     Plaintiff is informed and believes and thereupon alleges that Harvey and James transported the wooden sculpture to Baker Beach and burned it during their not-so-impromptu gathering that summer of 1986.  A handful of antiauthoritarian individuals attended that first gathering.

30.     Plaintiff is informed and believes and thereupon alleges that James and Harvey held Baker Beach parties again in 1987, 1988 and 1989.  The 1986 and 1987 parties were nothing more than picnics.  James's wooden figure in 1988 was much larger than prior year's figures creating a unique, prototypical, and, relative to the available resources, prodigious construction project for the 1988 party.

31.     Plaintiff is informed and believes and thereupon alleges that the planned scale and size of the 1988 figure made construction a daunting task for James because Harvey did not have the skills to assist.  James then met Plaintiff when he solicited Cacophony's help to build the 1988 figure.  Plaintiff and Cacophony were very interested in and supportive of the project, but were unable to assist that year.

32.     Plaintiff is informed and believes and thereupon alleges that in support of the project, Plaintiff and Cacophony spread the word in 1988 even though they could not attend, resulting in a doubling of attendance from 1987.

33.     Plaintiff is informed and believes and thereupon alleges that Plaintiff, Mikel and other Cacophony members attended the 1989 party and assisted logistically under Plaintiff's leadership and direction.

34.     Plaintiff is informed and believes and thereupon alleges that due in no small part to Plaintiff's and Cacophony's promotional efforts, attendance approximately doubled from 1988 to 1989 and doubled yet again from 1989 to 1990.  As a result of Cacophony members' word of mouth and Cacophony's newsletter, an estimated 200 to 400 participants and spectators attended the 1989 event.

FIRST AMENDED COMPLAINT

The term "Burning Man" was first used to describe the party by a Cacophony member in the June 1989 Cacophony newsletter announcement of a Cacophony "PARTY FOR THE BURNING MAN."

35.    Plaintiff is informed and believes and thereupon alleges that in 1989, James had a falling out with Harvey and their friendship became strained during the following year.  Nevertheless, James and Plaintiff constructed a forty foot figure for the 1990 party.  The figure was not burned at Baker Beach that year because the police took steps to shut the party down entirely.  With the help of Plaintiff's negotiating skills, the party was held but the figure was not burned.

36.    Plaintiff is informed and believes and thereupon alleges that after the failed 1990 Baker Beach burn, James withdrew from the project, leaving Plaintiff to take over James's role if there were to be any future parties.

37.    Plaintiff is informed and believes and thereupon alleges that completely independent of Harvey and James and their Baker Beach parties, Plaintiff and Cacophony member Kevin Evans had been planning a Cacophony event of their own in the Nevada high desert where participants could build things and destroy them at will.  The trip was dubbed and promoted by Cacophony as "Zone Trip #4."

38.    Plaintiff is informed and believes and thereupon alleges that during the weeks following the aborted 1990 burn, Harvey felt completely defeated and dejected and did not want to hold another beach party or burn again.  Plaintiff, however, saw the "defeat" as an opportunity.  Although he could have copied the idea and erected a structure with Evans on the high desert "playa" without Harvey, Plaintiff asked James to contribute the structure to Zone Trip #4 and honorably urged Harvey to be a part of the adventure.

39.    Plaintiff is informed and believes and thereupon alleges that the job of direction, logistics and transportation fell almost entirely on Plaintiff.  Those efforts as they related to the wooden figure were severely compromised, however, because major parts of the structure had been lost, stolen, destroyed or discarded when it was left in an empty lot near Folsom Street after the aborted Baker Beach burn.

40.    Plaintiff is informed and believes and thereupon alleges that through Plaintiff's principal leadership, frantic supervision, tenacity, credit cards, drive, ingenuity and access to the necessary tools, materials and facilities, the structure was repaired and reconstructed in time to join the

caravan to the playa. The rebuilding essentially transformed the wooden figure into the icon it is today, and Plaintiff's numerous design and technical contributions became integral to the structure's current trade dress, including the signature neon lights.

41. Plaintiff is informed and believes and thereupon alleges that once the repairs were completed, Plaintiff arranged for and supplied most of the transportation, materials and finances needed to make the event happen and organized the caravan that made the trip to Nevada. Mikel, as a Cacophony member, participated and established the "Black Rock Rangers" to oversee safety, security and communications needs, such as they were. Harvey, however, did not participate at all other than to arrive at the event as a spectator after it was completely set up.

42. Plaintiff is informed and believes and thereupon alleges that approximately eighty people attended Zone Trip #4. Although a fraction of the attendance at the previous Baker Beach party, it was deemed a success and Cacophony planned to repeat the event the following summer.

43. Plaintiff is informed and believes and thereupon alleges that he was recognized as the technical and logistical leader of the event. Plaintiff is recognized widely as the one individual without whose leadership and ability the event would not have been planned or produced. Plaintiff alone became recognized as the "face" of the event to the local residents and authorities, and was the event's facilitator, technical director and supervisor. The facilities, tools and materials needed to construct the event were provided by Central Services, and Central Services arranged to have the event covered under its insurance policy.

44. Plaintiff is informed and believes and thereupon alleges that Plaintiff also was the event's benefactor. In addition to funding the event with his credit cards, Plaintiff, Mikel and Central Services even paid Harvey's rent on occasion.

45. Plaintiff is informed and believes and thereupon alleges that after the 1990 event, Mikel's participation expanded to include the roles of *de facto* accountant, controller and/or treasurer.

46. Plaintiff is informed and believes and thereupon alleges that the 1990 event on the playa motivated Harvey to take a more active roll the next year, so he adopted the roll of artistic director thereafter.

47. Like the Baker Beach party, the Nevada event's attendance essentially doubled with each succeeding year and the Nevada event showed great promise as a commercial venture. Plaintiff

eventually found himself working on the event to the exclusion and neglect of Central Services and other economic pursuits. Therefore, Plaintiff informed Mikel and Harvey that he would have to withdraw he had something in writing that acknowledged his contributions to and rights and interests in the event and provided some sort of job security in the future.

48.     Plaintiff is informed and believes and thereupon alleges that Harvey and Mikel acknowledged Plaintiff's essential role in the event's success and that it would be impossible to continue without Plaintiff. Therefore, Plaintiff, Harvey and Mikel memorialized in writing their *de jure* general partnership (the "Partnership") by executing a written partnership agreement (the "Partnership Agreement," attached hereto as Exhibit A).

49.     Among other things, the Partnership Agreement recognizes that the Partnership's primary purpose was "to engage in organizing and conducting community art and performance festivals, and related activities, . . . to do all things incidental to or in furtherance of these enumerated purposes," and to "engage in any other business as may be agreed upon by the partners." The Partnership Agreement also established that each partner owned a one-third equal and undivided ownership interest in the Partnership. Article 10 of the Partnership Agreement provided that upon termination, the Partnership assets remaining after satisfying outstanding liabilities "shall be distributed to the Partners in proportion to their Partnership interests . . . ."

50.     Further memorializing their partnership, Plaintiff, Harvey and Mikel jointly filed an application in their names with the United States Patent and Trademark Office on August 15, 1994 to register the word mark BURNING MAN as a service mark on the Principal Register. The service mark was registered on September 12, 1995 under Registration No. 1,918,470 (hereinafter the "'470 Burning Man Mark").

51.     Plaintiff is informed and believes and thereupon alleges that as time progressed, Harvey's ego became more and more intertwined with the event and the image of the wooden figure. Harvey started to promote himself as the sole innovator, owner, director and decision maker of all that was Burning Man and increasingly promoted his own vision of establishing a cult of followers that bowed to the Burning Man.

52.     Plaintiff is informed and believes and thereupon alleges that eventually, Harvey began to dispute any suggestion that Plaintiff contributed to the development and success of the event. Not

only did he appear to have lost sight of the fact that but for Plaintiff, there would be no Burning Man in the Nevada high desert, he also failed to realize that without Plaintiff, he would not be playing the role of Burning Man's master of ceremonies.

53.     Plaintiff began to tire of Harvey's insinuations.  He did not want the Burning Man to become some sort of cult icon, either, and was concerned that the event was becoming so large that safety and security were likely to become paramount issues.  Plaintiff eventually felt that he could contribute to an event that was run as a source of self promotion and gratification for an individual rather than a source of release and enjoyment for the participants who made it possible.

54.     By 1986, Plaintiff's differences of opinion, philosophy and vision from Harvey were becoming insurmountable and Plaintiff decided it was time to pursue other opportunities.  While others in Plaintiff's position may sought revenge against Harvey by destroying the event, Plaintiff instead did the honorable thing for the sake of the participants and the event itself:  after satisfying himself that the event had reached a stage where it could continue without him, he suggested that the Partnership be dissolved in a manner that would be fair to all involved.

55.     After acrimonious negotiations, Plaintiff, Harvey and Mikel agreed on terms of dissolution by which Harvey assured Plaintiff that he would recognize and honor Plaintiff's contributions to the event, Plaintiff's rights to share in future events' successes, and the need to protect and promote the partnership's intellectual assets and associated good will in a way that would not deprive Plaintiff of his due.   Harvey's assurances, and Plaintiff's understanding of Harvey's assurances were then memorialized in the terms of an "Agreement for Dissolution of Partnership" (the "Dissolution Agreement," attached hereto as Exhibit B).  Plaintiff, Harvey and Mikel executed the Dissolution Agreement on July 22, 1997.

56.     Plaintiff is informed and believes and thereupon alleges that among other things, the Dissolution Agreement contained the following terms and conditions:

- The parties were to create a limited liability entity to be owned initially by Plaintiff, Harvey and Mikel in equal one-third interests and used for the sole and exclusive purpose of licensing the '470 Burning Man Mark;
- The parties were to assign the '470 Burning Man Mark and its associated good will to the newly formed entity;

- The newly formed entity was to license the '470 Burning Man Mark under terms that protected the mark from entering the public domain and that protected the entity and its members from liability resulting from the licensee's use;
- That an amount equal to the Partnership's outstanding cash liabilities be included as part of the licensing fee for the 1997 festival production;
- That if and when the '470 Burning Man Mark is sold or otherwise disposed of under specifically identified circumstances, the proceeds would be distributed among the partners in relation to their ownership interests;
- That only the entity, and not any of its members individually, may enter into licenses or other transactions for the '470 Burning Man Mark with third parties;
- That any licenses negotiated on behalf of Paper Man include certain minimum conditions and safeguards; and
- That the Partnership otherwise was to be terminated "in accordance with Article 10 of the [Partnership Agreement]."

57.     Plaintiff is informed and believes and thereupon alleges that Plaintiff, Harvey and Mikel were represented and advised by competent attorneys who were licensed by the State Bar of California in the negotiation and drafting of the Dissolution Agreement's terms and conditions.

58.     Plaintiff is informed and believes and thereupon alleges that on July 22, 2007, Plaintiff, Harvey and Law executed the Paper Man Operating Agreement (the "Operating Agreement," attached hereto as Exhibit C) which contains the provisions required by the Dissolution Agreement.  On July 24, 2007, Paper Man was registered as a limited liability company with the California Secretary of State.

59.     Plaintiff is informed and believes and thereupon alleges that Plaintiff, Harvey and Mikel were represented and advised by competent attorneys who were licensed by the State Bar of California in the negotiation and drafting of the Operating Agreement's terms and conditions.

60.     Plaintiff is informed and believes and thereupon alleges that on July 29, 2007, as a requirement of the Dissolution Agreement and the Operating Agreement, the assignment of the '470 Burning Man Mark from Plaintiff, Harvey and Mikel to Paper Man was recorded by the United States Patent and Trademark Office at Reel 1612, Frame 0893.

- 10 -

61.     The Operating Agreement unambiguously states that the members' sole capital contribution was the '470 Burning Man Mark.  A copy of the '470 Burning Man Mark's registration certificate was attached to further remove any doubt or ambiguity.  No other assets whatsoever were identified.

62.     The Operating Agreement also set out that all Members must be consulted prior to making decisions on behalf of Paper Man, and that Paper Man must keep a complete and accurate account of its business, and that its books and records must be open to inspection and copying by each Member or his authorized representative.

63.     Plaintiff is informed and believes and thereupon alleges that Mikel continued to work with Harvey after the Partnership dissolved and formed BRC with Harvey and became one of a number of managing directors chosen and appointed by Harvey.  Harvey became the lead managing director.

64.     Plaintiff is informed and believes and thereupon alleges that as Plaintiff predicted, attendance at the Burning Man event increased consistently over the years following the Partnership's dissolution.

65.     Plaintiff is informed and believes and thereupon alleges that as attendance and ticket prices increased, the fair market value of the license for the '470 Burning Man Mark increased as well.  Nevertheless, Paper Man annually reported license fee revenues that were sufficient only to pay Paper Man's necessary operating expenses.  Having shown no profit after payment of expenses, Plaintiff never received any payments from Paper Man.

66.     Plaintiff is informed and believes and thereupon alleges that Harvey and Mikel justified Paper Man's failure to obtain greater licensing fees on the ground that Burning Man did not operate at a profit because it was so expensive to mount.  Until the recent occurrence of events set out below, Plaintiff relied on Harvey's and Mikel's representations and assurances.

67.     Plaintiff is informed and believes and thereupon alleges that within the past year, Harvey and Mikel became hopelessly deadlocked and completely unable to agree on terms and conditions for '470 Burning Man Mark licensing agreement with BRC, the operation of Paper Man, the operation of BRC, and the operation of the Burning Man event.  During this past year, Plaintiff also discovered for the first time that BRC had been allowed to use the BURNING MAN service mark

1 | without entering into written licensing agreements with BRC.

2 | 68.    Plaintiff is informed and believes and thereupon alleges that within the past year,
3 | Harvey and BRC expressly announced that they never believed that Paper Man, Mikel and Plaintiff
4 | had rights to the '470 Burning Man Mark or any other of the Partnership's intellectual property assets.

5 | 69.    Plaintiff is informed and believes and thereupon alleges that within the last year, Harvey
6 | announced that he never intended to comply with the terms of the Dissolution Agreement or Operating
7 | Agreement and always believed the '470 Burning Man Mark was his alone.

8 | 70.    Plaintiff is informed and believes and thereupon alleges that within the past year,
9 | Harvey has expressly, specifically and unambiguously repudiated the Dissolution Agreement and
10 | Operating Agreement.  Additionally, Harvey has been reported to have unilaterally presented a
11 | licensing agreement to BRC with terms and conditions that were not discussed with or approved by
12 | other Paper Man members and which did not receive majority member consent as required by the
13 | Operating Agreement.  Harvey also was reported to have granted BRC the right to use the '470
14 | Burning Man Mark without signing a written license agreement and without paying a fee or payment
15 | of a fee only sufficient to cover Paper Man's minimal State filing requirements.  Lastly, Harvey
16 | reportedly granted BRC permission to use the '470 Burning Man Mark despite BRC's express refusal
17 | to agree to a written license's terms and conditions.

18 | 71.    Mr. Law, through his prior counsel, has repeatedly attempted to obtain information
19 | from Messrs. Harvey and Mikel directly and through their attorneys and agents about the use of
20 | various marks, either owned by Mr. Law (jointly with Harvey and Mikel) or by Paper Man LLC.  He
21 | has asked for financial, income and other information.  Unfortunately, his attempts have repeatedly
22 | been rebuffed.  It was not until Mr. Harvey and Mr. Mikel themselves had a falling out (leading to
23 | Mikel bringing a claim in arbitration against Harvey) that it was revealed that Harvey's actions were
24 | detrimental to the interests of Paper Man, LLC, and to that of Law, and even Mikel.  Prior to that time,
25 | however, it is clear that Mikel and Harvey, members of Black Rock City, as well as Paper Man LLC,
26 | were interested in receiving income and profits through Black Rock City that rightfully should have
27 | belonged to Paper Man, LLC.  Because Law was not a member of Black Rock City, he did not have
28 | the opportunity to share in these proceeds.

72.    Under these circumstances, Law's duty to make a demand prior to bringing this action

1  on behalf of Paper Man LLC is relieved because the records and correspondence we have seen

2  demonstrates such a demand would undoubtedly have been futile, as any claim or demand would have

3  been rejected or met with hostility, as indeed they were. Nonetheless, in conformity with Cal. Corp.

4  Code § 17501, Mr. Law has now notified Paper Man, LLC and its managers of his intention to file and

5  prosecute a derivative action for the benefit of the members of the LLC.

6      73.    Mr. Law has been a member of Paper Man, LLC since its inception. At all times

7  relevant herein, Mr. Harvey and Mr. Mikel have acted as the "Majority of Members" in managing

8  Paper Man and its affairs. As you are aware, based on the earlier filed complaint, by Mr. Law, as well

9  as the arbitration claim filed by Mr. Mikel, several issues of concern have arisen.

10     74.    Section 4.3 (a) of the Paper Man Operating Agreement ("POA") provides that

11 "distributions shall be made to the Members from time to time. . . such distributions to be in proportion

12 to their Voting interest." Mr. Harvey and Mr. Mikel have failed to declare any distributions through

13 the Paper Man LLC since 1996/1997, although the fair market value of the Burning Man mark has

14 indisputably increased. In this regard, Mr. Law believes that the majority members of Paper Man,

15 LLC have breached the 1994 Partnership Agreement, the Termination Agreement, the POA, as well as

16 their fiduciary duties. Mr. Law's belief was confirmed by Mr. Mikel's arbitration demands against Mr.

17 Harvey, as found in his "Second Amended Statement of the Claim at ¶¶ 5 and 9-18. For example, at ¶

18 14 of the Second Amended Statement, Mikel alleges: "Larry Harvey presumed to act for Paper Man

19 LLC in an unauthorized and ultra vires manner, and then used that position to obtain a benefit for

20 himself in his capacity as the "Director" and as a member of Black Rock City, LLC. His action was

21 simply the latest in a three-year series of efforts to seize control of the Burning Man mark, to exclude

22 other members of the Paper Man LLC from participation in the company's operations and control of its

23 assets, and ultimately to divert ownership of the mark from Paper Man LLC to Black Rock City LLC.

24 These actions were undertaken in secret and in complete contravention of Paper Man LLC's interests,

25 constitute a breach of the fiduciary duty that respondent Larry Harvey owes to Paper Man LLC, to its

26 other members, claimant Michael Mikel and respondent John Law." (*Id.* at ¶ 14.)

27     75.    Mr. Law has repeatedly inquired into the financial status of Paper Man on prior

28 occasions, and it has repeatedly been represented to him by Harvey, Mikel and their agents that Paper

   Man LLC has been operating at a loss, and, thus, there are no distributions to be made.    He has

- 13 -

1   recently learned this is not accurate, as shown above.

2       76.    Mr. Harvey, through his superior position at Paper Man and involvement with Black

3   Rock City, LLC, has misappropriated the Burning Man mark, infringed the Burning Man mark, and

4   has illegally transferred to Black Rock City, LLC rights to use and control the Burning Man mark, all

5   to the benefit of Harvey and Black Rock City, LLC, to Mr. Law's detriment and to the detriment of

6   Paper Man LLC. This same conduct also applies to the ownership interests in the other service marks

7   retained by the individual partners, including Law, upon dissolution, in particular, the "Black Rock

8   City", "Decompression," and "Flambe Lounge" marks.

9       77.    Pursuant to their dissolution agreement, Law, Harvey and Mikel formed Paper Man

10  LLC, a California limited liability company, on or around July 22, 2007. Each partner assigned all of

11  his right, title and interests in the Burning Man mark to Paper Man only. All other assets of the former

12  Harvey/ Law/Mikel partnership, other than the Burning Man service mark, were proportionately

13  distributed to each partner (33⅓ each), along with its liabilities for distribution to the partners upon

14  liquidation. These remaining assets of the partnership were not distributed, nor allocated by the July

15  22, 2005 dissolution agreement. Paper Man's principal business was to be licensing of the Burning

16  Man service mark, with requirements for any licensor to have certain quality controls, including

17  sufficient insurance. Licenses to third parties were to be granted in the sole discretion of the

18  company's members. Paper Man was to be "managed by all members." Moreover, "all assets of the

19  company", to wit, the Burning Man service mark, were solely owned by and to "be held in the name of

    the company," i.e. Paper Man.

20      78.    Law alleges that prior to the filing of the original federal court action, Harvey and Mikel

21  never reported or disclosed to him licensing or other revenues in amounts greater then the festival's

22  operating expenses. However, once Harvey and Mikel became adverse regarding the terms of the

23  licensing of the Burning Man mark to Black Rock City over the last 12 months, Law discovered

24  Harvey and Black Rock City were improperly and unilaterally using the Burning Man service mark

25  pursuant to a licensing agreement between Paper Man and Black Rock City, to which proper

26  authorization had not been obtained, in derogation of the dissolution and operating agreements by his

27  actions. Harvey has effectively repudiated the dissolution and operating agreements and asserted the

28  right to use the Burning Man mark without a license.

79.     Certain other marks are also at issue in this action. Law alleges that the partners (Law/Harvey/Mikel) first developed certain other service marks and used them continuously for commercial and artistic purposes between 1990 and 1996, including the marks of "Black Rock City," "Flambe' Lounge," and "Decompression;" and, likewise, by 1997, the partners had developed and first used the trade dress of the festival itself, including the trade dress of the neon-lit stylized wooden man figure developed/created in large measure by Mr. Law. However, Black Rock City subsequently improperly filed applications to register these three marks. A registration was issued for "Decompression" on December 30, 2003, under Registration No. 2, 800,513, claiming a first-use date of October 18, 1997. A registration for "Flambe' Lounge" issued on February 10, 2004, under Registration No. 2,813,064, claiming a first-use date of January 1, 1998. A registration for "Black Rock City" issued on June 21, 2005 under Registration No. 2,963,068, claiming a first-use date of September 1, 1995. Contrary to the representations of Harvey, Mikel and Black Rock City, those marks were developed and first used for commercial purposes by the partners, jointly, before 1997. The partners agreed upon, recognized and considered these marks to be assets of the Law/Harvey/Mikel partnership as of the summer of 1997. This is confirmed in correspondence and other writings.

80.     As noted above, when the Law/Harvey/Mikel partnership dissolved in 1997, Law individually, as well as the other partners, retained their ownership interests in all other assets, including, of course, marks not distributed in the dissolution agreement.

81.     The Burning Man partnership actually developed and first used the marks.

82.     Law has been damaged individually in that his ownership interests, as defined in the 1994 Partnership Agreement, the 1997 Dissolution Agreement and the POA have been adversely affected. His commercial rights and interest as a partner, or as a "member" under the dissolution agreement and operating agreement to (1) share in any profits, (2) to have access to accurate information about his interests, and (3) to control or manage the Burning Man mark through Paper Man, LLC, have been usurped, infringed and interfered with, and his individual interests, and the value of Paper Man LLC have each suffered a loss of value through Harvey's actions to control by infringement and the use of the three marks.

83.     As such, Law alleges a compensable commercial injury based on the conduct of Black

Rock City, Harvey and Mikel, and this conduct has harmed his ability as an interested former partner and owner of 33⅓ of the former partnership's undistributed assets, as well as a "member" of the Paper Man LLC under the dissolution and operating agreements to manage the use of the marks and reap the profits therefrom. In short, Harvey and Black Rock City are competing with Paper Man, and they have also usurped the remaining marks – the sole assets of the former partnership. Law's entitlement to licensing fees from the marks through Paper Man LLC under the partnership agreement have been actually impaired and injured.

84.     Law further alleges that he was never paid from Paper Man LLC, while other members have been paid, to his detriment, and to the detriment of Paper Man, LLC.

<div align="center">

FIRST CLAIM
(Cancellation of Trademark Registrations )

</div>

85.     Law believes and thereupon alleges that from 1989 thru 1994, the three partners – Law, Harvey and Mikel – developed the unique and distinctive trademarks, service marks and trade dress at issue here, including, but without limitation, the Burning Man service mark, stylized Burning Man Logo, the "Black Rock City," "Flambe Lounge," and "Decompression" service marks, and the trade dress of the Burning Man festival itself (the appearance and trade dress of the neon lit, wooden structure).

86.     These intellectual properties, and all of the goodwill associated with them, were developed and first used by the partners, including specifically Mr. Law, and were commercially used to advance the festival, and elsewhere, by the partners and the partnership; and, by the summer of 1997, the partners agreed these assets were owned by the partnership when the partnership and the partners.

87.     Law believes, and thereupon alleges, that the only asset transferred by the partners to the Paper Man, LLC was the Burning Man service mark. The remaining assets were not included in, or allocated by, the terms of the dissolution agreement. As such, by operation of law, and by the express agreements of the partners, these assets, and their associated goodwill, were distributed to Law, Harvey and Mikel pursuant to Section 10.1 of the August 15, 1994 partnership agreement, which provides that "Partnership assets shall be distributed to the partners in proportion of their partnership interests. . ."

<div align="center">

- 16 -

</div>

88.     Law is informed and believes and thereupon alleges that equity prefers that marks not be forfeited to the public domain and that remedies should be fashioned whenever possible to create a valid joint ownership of the mark as if coming from a single source without forfeiting the mark to the public domain.

89.     Law is informed and believes and thereupon alleges that on February 25, 2003, Black Rock City applied for registration of the mark "Decompression" in International Class 041 for "Organizing community festivals featuring art exhibits, conducting entertainment exhibitions in the nature of art festivals, and entertainment in the nature of art festivals." Black Rock City claimed a first use date of October 18, 1997 and the mark was registered on the Principal Register on December 30, 2003 with registration number 2,800,513 (the "'513 Registration").

90.     Contrary to the representation of Black Rock City, Harvey and Mikel, these marks were first used by the partners in relation to the to the Burning Man event from the 1980's through July of 1997, prior to the dissolution of the partnership, and these marks were partnership assets that were distributed one-third to Law, one-third to Harvey,  and one-third to Mikel, in proportion to the partnership interests pursuant to Sections 4.01 and 10.01 of the partnership agreement when the partnership dissolved.  Black Rock City was not the first to use the marks in commerce, and is not the true owner of the marks, as Law, Harvey and Mikel individually each owned proportionate shares of those assets.

91.     The same is true for the "Flambé Lounge" mark and the "Black Rock City" mark.

92.     In light of the above, Law requests that the Court order the PTO to cancel the '513, '064 and '068 registrations and declare either that the marks represented in those registrations have entered into the public domain, or in the alternative, declare that such marks are held in constructive trust by a *de facto* partnership comprised of Law, Harvey and Mikel for the benefit of such *de facto* partners and that the '513, '065 and '068 registrations be assigned or transferred to such *de facto* partnership.

93.     In light of the above, Law has, and will, request that the Court order the PTO to cancel the '513, '064 and '068 registrations and declare that such marks are owned by Law, Harvey and Mikel individually, in "proportion to their partnership interests set forth in Section 4.01" of the partnership agreement on the date of dissolution.

94.     Law will further request the Court to order defendants Black Rock City, Paper Man

- 17 -

FIRST AMENDED COMPLAINT

1   LLC and Mikel to provide an accounting for all activities from July 1997 to the present, and to award

2   Law his share of damages in the way of reasonable license fees, profits and income for that period of

3   time from any commercial use of the marks by Paper Man LLC, Black Rock City, Harvey and Mikel,

4   which were usurped, dissipated, and interfered with, and which should have gone to Paper Man LLC

5   and/or Law, plus pre and post judgment interest and all other damages available according to proof.

6
                                    SECOND CLAIM
7                               (Cancellation of Trademark)

8        95.    Law incorporates all of the allegations contained in the foregoing paragraphs as if fully

9   set out at length herein.

10       96.    Law is informed and believes and thereupon alleges that on February 14, 2003,

11  defendant Mikel individually applied for registration of the Burning Man event's unique "logo design"

12  (hereinafter the "Logo") in International Class 041 for "Organizing community festivals featuring art

13  exhibits, conducting entertainment exhibitions in the nature of art festivals, and entertainment in the

14  nature of art festivals." Mikel claimed his first use date as April 8, 1995, and the mark was registered

15  in Mikel's name only on the Principal Register on December 30, 2003 with registration number

16  2,800,469 (the "'469 Registration").

17       97.    As noted, contrary to Mikel's representations, this mark was developed and first used in

18  relation to the Burning Man event by the partners years prior to Mikel's stated first use date, and prior

    to the dissolution of the partnership. This logo design was an asset of the partnership that either
19
    became an asset of Paper Man LLC under the dissolution agreement, or was distributed
20
    proportionately to each partner upon the dissolution pursuant to Sections 4 and 10 of the partnership
21
    agreement.
22
         98.    In light of the above, Law will request that the Court order the PTO to cancel the '469
23
    Registration and to assign and transfer the '469 Registration to Law, Harvey and Mikel in conformity
24
    with the provisions of their 1994 partnership agreement at Sections 4.1 and 10.1.
25
         99.    In light of the above, Law will further request that the Court order all defendants to
26
    provide an accounting for all activities from 1997 to the present, plus damages and pre and post
27
    judgment interests.
28

                                              - 18 -

### THIRD CLAIM
(Unfair Competition)

100.    Law is informed and believes and thereupon alleges that Black Rock City has misappropriated the use of the service marks "Burning Man", "Decompression," "Flambé Lounge" and "Black Rock City." This use has caused confusion in that third parties have been led to believe, by the false, deceptive, or misleading representations of Black Rock City, Harvey and others, that Black Rock City, rather than individual former partners, including John Law, is the owners of these marks. The unauthorized use by Black Rock City, or improper false claim of ownership of these marks, infringes the rights of the actual individual owners and former partners under Section 43(a) of the Lanham Act, 15 U.S.C. § 1152(a), and Law has personally and individually been damaged by such unauthorized use, as his rights to control and manage the marks have been interfered with, and his ability to share in profits derived from the commercial use of these marks has been impaired.

101.    Further, Law is informed and believes and thereupon alleges that Black Rock City's unauthorized use of the stylized Burning Man logo has caused confusion as to the true ownership of that mark by Paper Man LLC. Such unauthorized use infringes the rights of Paper Man LLC under Section 43(a) of the Lanham Act, 15 U.S.C. § 1152(a), and Law, Paper Man LLC, and/or the former partners have been actually has been damaged by this unauthorized use.

102.    Law is informed and believes and thereupon alleges that Black Rock City's unauthorized use of the Burning Man Festival trade dress and the trade dress that comprises the Burning Man structure has also led to confusion as to the true ownership of such marks and trade dress. Such unauthorized use infringes the rights of the former partners under Section 43(a) of the Lanham Act, 15 U.S.C. § 1152(a), Law's interests and rights, as agreed upon in Section 4.1 and 10.1 of the 1994 partnership agreement has been actually damaged by this unauthorized use, and potentially his interest under the Paper Man LLC agreement.

103.    In light of the above, Law will request that Black Rock City and Harvey be enjoined from using the above-stated service marks and trade dress, or claiming ownership of the same, and Law requests that the Court order Black Rock City to submit to an accounting for all activities from 1997 to the present. Law will further request the Court to award him his proportionate share of the assets and profits therefrom for such past use, plus pre and post judgment interest thereon, as well as

other available damages.

104.    Law is informed and believes and thereupon alleges that Mikel and Harvey, in breach of their fiduciary duties and contractual obligations, have permitted Black Rock City to usurp Paper Man LLC's intellectual property assets and the assets awarded each "former partner" upon dissolution of the partnership per Section 4.1 and 10.1 of the partnership agreement without Law's permission and consent, in derogation of his management rights and obligations, under the partnership agreement.

105.    Law is informed and believes and thereupon alleges that such unauthorized use and misappropriation of his individual rights, and those of Paper Man LLC to the above intellectual property assets has caused confusion as to the true ownership of such marks and trade dress. This unauthorized use infringes the rights of Law and of Paper Man LLC under Section 43(a) of the Lanham Act, 15 U.S.C. § 1152(a), and Law and Paper Man LLC have each been damaged by such unauthorized uses.

106.    Law will request that Mikel, Harvey and Black Rock City be enjoined from using the marks, and that Harvey, Mikel and Black Rock City be ordered to submit to an accounting for all activities from 1997 to the present. Law will further request that he and Paper Man LLC be awarded their share of damages, plus pre and post judgment interest thereon.

FOURTH CLAIM
(MISPREPRESENATION OF FACT)

107.    Law incorporates all of the allegations contained in the foregoing paragraphs as if fully set out at length herein.

108.    Law alleges that by virtue of their roles as managers and officers of Paper Man LLC, and as former partners of Law, who continued to share joint ownership interests with Law in certain assets (marks) Harvey and Mikel owed fiduciary duties to Law, and, as such, at all times from 1997 to the present, Harvey and Mikel had a duty to disclose all material facts, particularly facts that they knew were not known to Law about Paper Man and as to the handling of the partnership assets.

109.    Law is informed and believes and thereupon alleges that Harvey and Mikel knowingly omitted, suppressed, and concealed material information to, among others, Law, to the effect that (1) they were unilaterally transferring the management of the Burning Man mark from Paper Man LLC to Black Rock City, (2) they were failing to account for any income from the commercial and other use of

1 the Burning Man service mark to Paper Man LLC, Law or Mikel, and (3) contrary to the true facts, and

2 in derogation of the rights and duties owed under the 1994 partnership agreement, they were was

3 usurping, for their and Black Rock City's sole benefit, the use of other assets of Law individually,

4 other marks and trade dress developed by the partners between 1989 and July of 1997.  Harvey and

5 Mikel breached the fiduciary duties as members and managers of Paper Man LLC, and as a former

6 partner of Mikel and Law, by suppressing information about their conduct in usurping the commercial

7 use of the marks and profits and income therefrom.

8       110.    Law is informed and believes and thereupon alleges that Harvey and Mikel

9 intentionally suppressed this information from the other members of Paper Man LLC, including

10 himself and Mikel.  Harvey and Mikel also affirmatively represented to Law on numerous occasions

11 between 1997 and 2007 that they were earning no money from the marks, and there were no profits to

12 distribute.  These allegations were false, and Law actually and justifiably relied upon them in failing to

13 assert his rights or take other actions, all which have caused him actual damages.  Harvey and Mikel

14 suppressed this information from Law in order to prevent him from asserting his ownership rights in

15 the marks as a former partner and as a member of Paper Man LLC.  These omissions were material in

16 that they prevented Law from asserting his rights or ensuring the rights of Paper Man LLC were

17 protected.  Law was unaware of the true facts and actions of Harvey and Mikel, and he would have

acted sooner if he had known.

18       111.    As a direct, proximate and foreseeable result of the conduct set out above, Law and

19 Paper Man LLC have been injured in amounts in excess of the jurisdictional limits of the court

20 according to proof.

21       112.    The defendants committed the above acts alleged herein fraudulently, oppressively and

22 with an improper motive amounting to malice with the wrongful intention of injuring Law and

23 depriving Law of his property.  Alternatively, Harvey's conduct was carried out in conscious disregard

24 of Law's and Mikel's rights.  Therefore, as a direct, proximate and foreseeable result of Harvey's

25 conduct, Law also is entitled to recover exemplary damages.

26 <center>FIFTH CLAIM FOR RELIEF</center>
27 <center>(Unfair Competition and False Advertising in Violation of the Lanham Act )</center>

28       113.    Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), forbids the use of false

<center>- 21 -</center>

representations in advertising.  Law alleges that from 1997 to the present, defendants Black Rock City, Harvey and Mikel falsely represented in commercial advertising that they were the true owners of (1) certain of the former partnership's assets which, in reality, upon dissolution, devolved to each partner proportionately pursuant to Sections 4.1 and 10.1 of the 1994 partnership agreement, and (2) the Burning Man service mark asset that passed to Paper Man LLC, per the terms of the dissolution agreement.

114.   Law alleges that said defendants knew that their representations were material and false in that the service marks and trade dress at issue were actually developed and first commercially used by Law/Harvey/Mikel as individuals and partners in connection with the Burning Man Festival and related art festivals prior to the dissolution of the partnership in 1997.

115.   Law alleges that said defendants intended for others to rely on their false representations, and that others have, in fact, relied upon these false representations.

116.   Law alleges that said defendants wrongly profited from their intentionally false and misleading representations as to their sole and exclusive ownership and/or control of these assets.

117.   Law has individually and in his capacity as a member of the Paper Man LLC suffered actual pecuniary injury as a direct, proximate and foreseeable consequence of said defendants' violations of Section 43(a) of the Lanham Act.

118.   As a direct, proximate and foreseeable result of said defendants' violations of Section 43(a) of the Lanham Act, Law is entitled to all relief available under the Lanham Act including injunctive relief, disgorgement of all ill gotten gains, damages, and reasonable attorneys' fees and costs.

119.   Black Rock City, Harvey and Mikel committed the acts alleged herein fraudulently, oppressively and with an improper motive, and with the wrongful intention of injuring Law. Alternatively, said defendants' conduct was carried out in conscious disregard of Law's rights. Therefore, as a direct, proximate and foreseeable result of said defendants' conduct, Law also is entitled to recover exemplary damages as permitted by law.

SIXTH CLAIM
(Declaratory Relief as to the Rights and Duties of the Parties)

120.   Law incorporates all of the allegations contained in the foregoing paragraphs as if fully

- 22 -

set out at length herein.

121.    Law is informed and believes and thereupon alleges that the terms of the 1994 Partnership Agreement, the 1997 Dissolution Agreement and the Paper Man Operating Agreement Law's assents to the Partnership Agreement, are at issue and /or are neglected by Harvey's and Mikel's breaches of fiduciary duty and failure to abide by the terms of these agreements, whether intentionally, negligently, or otherwise, and, as such, Law, individually and Paper Man LLC have been injured.

122.    Law respectfully desires and will request that the Court declare the rights and obligations of the parties under these agreements.

SEVENTH CLAIM FOR RELIEF

123.    Law incorporates all of the allegations contained in the foregoing paragraphs as if fully set out at length herein.

124.    Law is informed and believes and thereupon alleges that California Corporations Code § 17351 allows for judicial dissolution of a limited liability company when, among other things, dissolution is reasonably necessary for the protection of the complaining partner, when the management of the company is deadlocked or subject to internal dissention, or when those in control of the company have been guilty of, or have knowingly countenanced persistent and pervasive fraud, mismanagement, or abuse of authority.

125.    Law alleges that Paper Man's dissolution is necessary because Harvey and Mikel have *abused* their authority as managers of Paper Man and as owners of Paper Man's sole asset (i.e., the Burning Man service mark) to his detriment as a member of the LLC with an ownership interest in that mark and with his own right and duty to manage that mark as part of Paper Man's operation.  In this regard, Law, on behalf of himself and the corporation has repeatedly made demands for information from the remaining managers of Paper Man LLC, but they have refused to provide such information.

126.    Law alleges that Paper Man's dissolution is the only reasonable and equitable solution to Harvey's and Mikel's persistent and pervasive fraud, mismanagement and abuse of authority,  and improper transfer of his ownership in certain marks and his and Paper Man's interests in the Burning Man mark to Black Rock City.

127.    In light of the above, Law will request relief by way of an appraisal of Paper Man's

- 23 -

1  assets pursuant to California Corporations Code § 17351(b)(3), judicial dissolution of Paper Man, and

2  distribution of its assets among Law, Harvey and Mikel.

EIGHTH CLAIM
(Breach of Fiduciary Duty)

5  128.    Law incorporates all of the allegations contained in the foregoing paragraphs as if fully

6  set out at length herein.

7  129.    Law is informed and believes and thereupon alleges that as the former partners in the

8  partnership, Harvey and Mikel owed Law a duty to abide by the terms of the 1994 partnership

9  agreement when read in conjunction with the 1997 partnership dissolution agreement.

10  130.    Law alleges that Harvey and Mikel also owed Law a duty to abide by the contractual

11  obligations of the former partnership, as set forth in Sections 4.1 and 10.1 of the 1994 partnership

12  agreement as to their proportioned interests in those assets of the former partnership not governed by

13  the dissolution agreement; these assets included all the benefits of the service marks and trade dress

14  assets, and the like, other than the Burning Man mark that became the sole asset of Paper Man LLC.

15  131.    Law further alleges that, as voting and managing members of Paper Man, Harvey and

16  Mikel owed Law a separate and distinct duty to carry out Paper Man business with the highest good

17  faith toward Law and with the loyalty of fiduciaries.

18  132.    Law alleges that Harvey's and Mikel's positions with Black Rock City and the

19  continuing Burning Man festival created interests in Harvey and Mikel that conflicted with their

20  interests in and duties of utmost good faith to Law, as their former partner, and, to him, as a member of

Paper Man, and to Paper Man, itself.

21  133.    Law alleges that Harvey and Mikel violated their fiduciary duties of utmost good faith

22  and loyalty to Law by obtaining advantages for themselves as to (1) the former partnership's assets and

23  (2) their duties to Paper Man through the use of affirmative misrepresentation and concealment.

24  134.    Law alleges that Harvey and Mikel violated their fiduciary duties of utmost good faith

25  and loyalty to Law by usurping and claiming his intellectual property assets as their own, and to him as

26  a member of Paper Man by licensing the Burning Man mark at below fair market rates with

27  insufficient quality safeguards to Black Rock City and for their own secret profit and benefit.

28  135.    Black Rock City, Harvey and Mikel committed the acts alleged herein fraudulently,

- 24 -

oppressively and with an improper motive amounting to malice with the wrongful intention of injuring Law and/or Paper Man. Alternatively, said defendants' conduct was carried out in conscious disregard of Law's and Paper Man's rights. Therefore, as a direct, proximate and foreseeable result of the counter defendants' conduct, Law also is entitled to recover punitive and exemplary damages in the maximum amount permitted by law and due process.

### NINTH CLAIM
### (Breach of Contract)

136. Law is informed and believes and thereupon alleges that the 2006 Burning Man event's gross income exceeded $10,000,000.

137. Law is informed and believes and thereupon alleges that the fair market value for a license for the 2006 event could range from $300,000.00 to more than $1,000,000.00.

138. Law alleges that he has, from the beginning, performed all of the obligations required of him by the operating agreement and dissolution agreement, yet Harvey, Mikel and Paper Man breached the operating agreement and dissolution agreement by failing to properly account for income and profits owed to Paper Man LLC and Law, and by diverting the proceeds owed to Paper Man LLC to themselves through their roles as members of Black Rock City.

139. Law is informed and believes and thereupon alleges that Harvey, Mikel and Paper Man breached the Operating Agreement by failing to pay Law his share of the fair market value for a license for the '470 Burning Man Mark.

140. Law is informed and believes and thereupon alleges that Harvey, Mikel and Paper Man also breached the Operating Agreement by continually failing to provide an accurate and detailed accounting to Law or make Paper Man's books available for Law's inspection.

141. Law has been damaged by the aforementioned breaches and seeks all reasonably foreseeable damages directly and proximately caused by such breach

### TENTH CLAIM
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

142. Law incorporates all of the allegations contained in the foregoing paragraphs as if fully set out at length herein.

- 25 -

143.   Law is informed and believes and thereupon alleges that California implies in all contracts a covenant that the parties will act in good faith and deal fairly with each other.

144.   Law alleges that the facts establish that Harvey and Mikel, individually as his former partners, and as managing members of Paper Man, breached the covenants of good faith and fair dealing that are implied in the partnership agreement, dissolution agreement and the operating agreement.

145.   Law has actually been damaged by the aforementioned breaches and seeks all reasonably foreseeable damages directly and proximately caused by such breach that are available under the laws of California and the United States.

<div align="center">

ELEVENTH CLAIM
(Negligence)

</div>

146.   Law incorporates all of the allegations contained in the foregoing paragraphs as if fully set out at length herein.

147.   Law is informed and believes and thereupon alleges that Harvey and Mikel allowed the cancellation of the '470 Burning Man Mark registration by negligently failing to file required affidavits before the sixth anniversary of the mark's registration date or within the grace periods permitted thereafter.

148.   Law is informed and believes and thereupon alleges that as a direct and proximate result of Harvey's and Mikel's negligence, the '470 Burning Man Mark lost the protections and assumptions afforded by its registration, and additionally lost the ability to become "incontestable" by the PTO.

Law is informed and believes and thereupon alleges that loss of such status, for no matter how little time, negatively impacts the value of the mark and its associated good will, thereby causing injury to both Paper Man and Law.

149.   Law is further informed and believes and thereupon alleges that Harvey and Mikel negligently ceded control of the '470 Burning Man Mark, the "Flambé Lounge," "Decompression" and "Black Rock City" service marks, the Burning Man event's distinctive trade dress and its unique, stylized logo to Black Rock City, to the detriment of the former partners' individual and proportionate ownership interest, and as well as the separate interests of Paper Man LLC.

150.   Law is informed and believes and thereupon alleges that Law has been damaged by

<div align="center">

- 26 -

</div>

such aforementioned negligence in amounts that are subject to proof.

151.   In light of the above, Law requests damages from Harvey and Mikel in an amount that is subject to proof.

<center>THIRTEENTH CLAIM<br>
(Violation of California Business and Professions Code § 17200)<br>
as Against Harvey, Mikel and Black Rock City)</center>

152.   Law incorporates all of the allegations contained in the foregoing paragraphs as if fully set out at length herein.

153.   Law alleges that Harvey's, Mikel's and Black Rock City's actions are unlawful, unfair and deceptive methods of competition, in violation of California Business and Professions Code § 17200, *et seq.*

154.   As a direct, proximate and foreseeable result of such defendants' violations of California Business and Professions Code § 17200, Law has personally suffered actual financial injury and injury to his property rights.

155.   As a direct, proximate and foreseeable result of such defendants' violations of California Business and Professions Code § 17200, Law is entitled to disgorgement by Harvey, Mikel and Black Rock City of any property income funds or profits they obtained to his detriment and to the detriment and injury of Paper Man LLC., plus pre and post judgment interest at the legal rate, reasonable attorneys' fees and costs, and any and all penalties permitted pursuant to the laws of the States of California and the United States.

**WHEREFORE, PLAINTIFF PRAYS** for relief as follows:

(1)   Declaratory Relief;

(2)   For Damages;

(3)   Restitution;

(4)   Dissolution;

(5)   Injunctive Relief;

(6)   Attorneys' Fees and Costs; and

<center>- 27 -</center>

(7) Prejudgment Interest.

Dated: October 26, 2007

Ellis, Coleman, Poirier, LaVoie, & Steinheimer LLP

By ____/s/_____
    Kimberly Lewellen
    Attorney for Defendant(s)
    PLAINTIFF JOHN LAW

- 28 -